# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | Criminal Action No. CCB-16-267 |
| v. | * | |
| | * | |
| DANTE BAILEY, *et al.* | * | |
| | * | |
| | * | |

***** 

## AMENDED MEMORANDUM

The defendants in this case were convicted of a variety of racketeering conspiracy, conspiracy to distribute controlled substances, firearm possession, and murder charges. Now pending are a motion to reopen the suppression hearing and for a new trial for defendant Sydni Frazier (ECF 1502) and a motion for a new trial for remaining defendants Dante Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, and Shakeen Davis (ECF 1505). The defendants also submitted a supplemental memorandum (ECF 1514) in support of their motion, offering additional evidence. The government opposed these motions in one consolidated response (ECF 1554), and the defendants replied in support of their original motions (ECF 1609; ECF 1622). Other supplemental memoranda have been filed and are considered in this opinion.[1]

The defendants argue that a police officer involved in the investigation failed in 2016 and 2017 to disclose his past misconduct (not directly related to their case) in search warrant affidavits that produced evidence used against them; they argue that this evidence is tainted and that they should all get new trials. A supplemental memorandum (ECF 1691) identifies two 2009 cases in which, they say, the officer lied. The government responds that the misconduct in question is mere impeachment evidence that does not contradict the substantive facts used to

---

[1] The court also has considered the various motions to seal, which are not opposed. Finding that sealing is justified based on the well-documented risk public identification poses to cooperating witnesses in criminal cases, particularly those involving violence such as this one, the motions will be granted.

support probable cause for those searches; regardless, he did not testify at trial, and evidence tied to him was amply corroborated.

The issues have been briefed, and no oral argument is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons stated herein, the court will deny the defendants' motions.

## BACKGROUND

Detective Ivo Louvado was a corrupt Baltimore City police officer who, while executing a search in February 2009 with a squad including certain other corrupt BPD officers, stole and resold three kilograms of cocaine — a fact that did not surface with direct evidence until April 2019. In 2010, he was detailed to a task force with the Bureau of Alcohol, Tobacco, and Firearms (ATF). While on the ATF task force, he participated in an investigation of the defendants' criminal enterprise. The relevant details of that investigation, the defendants' prosecution, and the investigation into Louvado follow.

### Investigation

*The MMP investigation: Homeland Security (2015) and ATF (2016–17)*

In March 2016, the ATF became involved in an investigation of a Bloods gang subset known as the Murdaland Mafia Piru (MMP). But key evidence used in the eventual MMP prosecutions was generated even before the ATF's involvement.

The investigation of MMP was years in the making, and it was conducted by over a hundred federal, state, and local law enforcement officers even before Louvado's and the ATF's involvement. Before ATF's involvement, law enforcement officers from Homeland Security Investigations and Baltimore County and City police investigated MMP. Officers conducted traffic stops and searches from February through May of 2015, the evidence from which was used to obtain authorization in June and July 2015 for wiretaps of the gang's heroin supplier —

2

ultimately, there were eight wiretaps. Based on these intercepted communications (in which the heroin supplier discussed drug trafficking, guns, and violence with MMP members including defendants Bailey and Lockley), investigators conducted more traffic stops and searches, seizing drugs and other evidence in the summer of 2015. This investigation wound down that summer and included Bailey's July 2015 arrest.

Outside of the 2015 HSI/BCPD/BPD investigation, routine police work also yielded evidence supporting the MMP prosecutions, much of it predating Louvado's and the ATF's involvement. Service calls, traffic stops, and seizures in 2012, 2014, 2015, and 2016 led to the recovery of drugs, guns, and cash from the defendants.

After the ATF's involvement, which began in March 2016, investigators conducted four wiretaps in July and August 2016. They used confidential informants to engage in recorded controlled narcotics purchases, going on to search Bailey's home in May 2016 and his iCloud account in August 2016 as well as 36 seized phones and electronic devices and social media accounts in January 2017. A February 2017 arrest of Davis yielded drugs, a gun, $1,373 in cash, and four cell phones. Intercepted jail communications in September 2017 revealed that Bailey had ordered a hit on a cooperating witness, and a search of the assigned hitman's home yielded guns, a bulletproof vest, cell phones, and the hit letter itself. Jail calls throughout this period implicated the defendants in a wide variety of criminal activity, and forty-five such calls were introduced at trial. The evidence at trial was overwhelming.

*Louvado's participation in the ATF investigation*

Louvado was part of the MMP investigation after the ATF joined. There were two instances in the 18-month investigation where Louvado acted outside the presence of other officers in a moment or manner germane to the MMP case.

3

- First, he participated in a July 2016 controlled narcotics purchase in which he was unaccompanied while he checked the confidential informant beforehand to make sure the informant did not have any contraband. The actual transaction, however, was audio- and video-recorded, and other officers were involved in the buy itself and the recovery of the evidence. Evidence of this controlled buy was not introduced at trial, nor was information about it included in any search warrant.
- Second, in August 2016, Louvado surveilled Lockley as Lockley exited his home, got into a car, and drove away. Louvado captured video corroborating his observations.

Other than these two instances, there are no records of Louvado being alone with evidence or in a position to fabricate information used later in the investigation.

The focus of the defendants' motions is Louvado's role in certain wiretaps and search warrants between June 2016 and March 2017:

- Louvado was the sole affiant for wiretaps of Dwight Jenkins (TT1) and Jacob Bowling (TT2), approved in June 2016. (ECF 1505-4, TT1/TT2 Wiretap Application). The probable cause was based on a series of four audio- and video-recorded controlled buys and text messages with informants in May and June 2016. Louvado wrote the report for one of the controlled buys but was accompanied at all times by other officers; he did not participate at all in the others.
- That same affidavit was incorporated by reference into an ATF lead investigator's July 2016 application for a wiretap of Lockley (TT3). (ECF 1505-5, TT3 Wiretap Application). The application discussed two calls from the TT1 wiretap, but the TT3 probable cause was mainly based on a March 2016 controlled buy that Louvado was not involved in. (*Id.* at 39–43). TT1 and TT2 information and the Louvado affidavit was similarly incorporated by reference into an ATF investigator's August 2016 application for a wiretap of Anderson (TT4). (ECF 779-5, TT4 Wiretap Application ¶ 51).
- Louvado applied in September 2016 for a warrant to search several residences and vehicles, including Lockley's home, Anderson's home and business, and Davis's home. (ECF 1505-7, Takedown Warrant). The probable cause was based on wiretap calls, a recorded controlled buy (during which Louvado was accompanied at all times), and a confidential informant.
- Louvado applied in February 2017 for a warrant to search Frazier's cell phones; the probable cause was based on ballistic and DNA evidence from a homicide investigation Louvado was not part of and testimony about Frazier's arrest, given by someone other than Louvado. (ECF 1505-8 ¶¶ 13, 18–19, Frazier 1/25/17 Cell Phone Warrant). So, too, for a February 2017 warrant application to search Frazier's Instagram account, the probable cause for which was based on public Instagram posts, the aforementioned homicide investigation, and a recorded jail call. (ECF 1505-9, Frazier @Getmneyboy Instagram Warrant).

- Louvado applied in March 2017 for a warrant to search Davis's cell phones; the probable cause was based on the circumstances of Davis's arrest, which Louvado was not involved in. (ECF 1505-10, Davis 2/24/17 Cell Phone Warrant).
- Louvado applied in March 2017 for a warrant to search Davis's Instagram, based on Davis's arrest and public Instagram posts. (ECF 1554-1, Davis @fh_dinero Instagram Warrant).

The defendants do not allege any specific false statements of substantive fact. Instead, they take issue with Louvado's statements of his own veracity, since he did not disclose his February 2009 drug thefts in these 2016 and 2017 affidavits and applications. For example, in affidavits supporting search warrant applications for Frazier's cell phones and Instagram account and Shakeen Davis's cell phones, Louvado declared that he had not "excluded any information known to [him] that would defeat a determination of probable cause." (ECF 1505-8, Frazier 1/25/17 Cell Phone Warrant 5 ¶ 11). The defendants argue that Louvado's omission of his 2009 theft and resale of cocaine constitutes an omission that would have defeated probable cause.

**The MMP prosecutions**

These investigatory efforts led to September 2016 and June 2017 federal grand jury indictments of the defendants for racketeering conspiracy, a variety of drug and gun offenses, and murder in aid of racketeering. (ECF 46, Indictment Sep. 22, 2016; ECF 515, Indictment June 1, 2017).

Frazier moved in August 2017 to suppress evidence from the searches of his cell phone and Instagram account. (ECFs 590–94). There was no evidentiary hearing, and the motions were denied in August 2018. (ECF 875). Anderson and Lockley moved to suppress evidence from the searches of their homes and evidence from the ATF wiretaps. (ECF 399, 398, 492, 493). Notably, Davis did not move to suppress evidence from the searches of his cell phones or

Instagram account. (*See* ECFs 385–91, 689–90, 694, 746). None of the defendants requested *Franks* hearings to challenge Louvado's sworn statements.

There were two hearings on pretrial motions, the first in June 2018 (ECF 800) and the second in August 2018 (ECF 873). Louvado testified at the first hearing, exclusively addressing a custodial statement made by defendant Dent during a transport ride. He did not testify at the second hearing.

The defendants went to trial in March 2019 and all were convicted in April 2019 (ECFs 1149–77, 1180), except for Frazier; due to a medical emergency his counsel experienced mid-trial, Frazier's case was severed via mistrial, and he was convicted in March 2020 after a retrial. (ECF 1453).

### The investigation of Louvado

Unbeknownst to the MMP defendants, at the same time as their case was progressing, the United States Attorney's Office was investigating corruption within BPD's Gun Trace Task Force, since then the subject of significant media coverage. Members of the GTTF were indicted for racketeering and racketeering conspiracy in February 2017, five months after the MMP indictment.

Louvado, however, was not a member of the GTTF, and his name had not come up in the GTTF investigation until July 2017, when a GTTF member admitted in a proffer that he and another officer had stolen money while executing a February 2009 search; he suspected that a third officer had also stolen that night. (ECF 1554-6, 7/17/17 Jenkins Proffer). That GTTF member did not name Louvado in the same way as he named himself and two others as potential thieves; he noted only that shortly after that, Louvado had bought a boat. (*Id.* at 3, 5). He did not offer direct evidence that Louvado had participated in the misconduct, but rather seemed to have

inferred from Louvado's presence at the February 2009 search and from his purchase of a boat that Louvado had participated. (*Id.* at 5). In August 2017, USAO supervisors and GTTF prosecutors met with the MMP trial AUSAs to summarize the developments, and they explained that the GTTF officer had not seen Louvado steal money, had never talked to Louvado about it, and did not know whether Louvado had participated. (ECF 1554 at 41). Subpoenas of Louvado's financial records did not show large cash deposits shortly after the February 2009 search. (*Id.* at 43–44).

Months later, in March 2018, a former bail bondsman close to a GTTF officer told investigators that Louvado had "got proceeds" from the February 2009 search, but that bail bondsman was not present at the search (ECF 1554-8, Stepp Proffer), so his knowledge was second-hand. When GTTF investigators interviewed Louvado first in May 2018 (ECF 1554-10, Louvado Interview) and again in February 2019 (ECF 1554-12, Louvado Interview), he denied any knowledge of criminal activity.

Federal GTTF investigators did not have direct evidence of Louvado's misconduct until a witness's April 2019 proffer (three weeks into the MMP trial), in which he recounted that he had seen Louvado steal the drugs in February 2009. (ECF 1554-13, Gladstone Proffer). The GTTF investigators notified USAO supervisors of the direct evidence of Louvado's misconduct, but the USAO's *Giglio* officers advised the MMP trial AUSAs that no *Giglio* obligation existed because (1) Louvado was not a trial witness; (2) the information in Louvado affidavits was independently verifiable; and (3) the GTTF investigation was still underway with potential covert steps to be taken. (ECF 1554 at 48–49).

The April 2019 proffer's direct evidence led to further investigation and the January 2020 official opening of a confidential matter against Louvado as a criminal target. The government

filed a March 2020 criminal information against Louvado for lying to investigators about the drug theft, and he pled guilty on November 6, 2020. (ECF 8 in *United States v. Louvado*, Crim. No. 20-cr-0098-CCB (D. Md. filed Mar. 11, 2020)).

**Previous cases with suspected Louvado dishonesty**

The defendants also raised concerns about two prior cases in which Louvado was an investigating agent. According to the defendants, these two cases gave the government reason to doubt Louvado's credibility as early as 2009.

First, the defendants raised a 2009 criminal case in which Louvado was an investigating agent. *United States v. Tyrone Powell and Gregory Fitzgerald*, Crim. No. L-09-0373 (now CCB-09-0373) (D. Md. criminal complaint filed June 22, 2009). The defendants filed a motion to suppress evidence from a car stop because of alleged lies by Louvado, but Judge Legg ruled in the Government's favor. (ECF 1554-16, Ex. 16, *Powell/Fitzgerald* Joint App'x at 169–96, 232). After the order, Powell pled guilty, and the Government elected in November 2009 to dismiss the charges against Fitzgerald. (ECF 63 (Nov. 10, 2009) in *Powell*; ECF 1554-16 at 251–60). Despite the dismissal, Judge Legg concluded that the defense had "chipped around the edges" of Louvado's testimony but had "not overcome . . . the credibility of [Louvado's] testimony" about the hand-to-hand drug transaction that had occurred. (ECF 1554-16 at 259). The Government dismissed the Fitzgerald case because Fitzgerald was under investigation in another matter and a separate, future indictment was possible. (*Id.* at 247–49). Fitzgerald was later indicted and pled guilty in *United States v. Fitzgerald*, WDQ-12-289 (D. Md. Filed May 15, 2012).

Second, the defendants raised in their supplemental memorandum another case, *United States v. Gerrod Davis*, Crim. No. CCB-09-0400 (D. Md. Filed July 21, 2009). Davis had filed a September 2009 motion to suppress evidence obtained pursuant to a search warrant sworn out by

Louvado, and he requested a *Franks* hearing. (ECF 1514-1, *Davis* ECF 15). The motion alleged that certain critical allegations were false, and it included witness and documentary evidence indicating that Louvado had actually been in Towson at a time when he said he had been observing the defendant sell drugs. (*Id.* at 3). The motion also accused Louvado of misstating information from an online database and of other misconduct. (*Id.* at 3–4). The Government did not respond to this motion to suppress, instead dismissing the indictment in December 2009. (ECF 1514-2, *Davis* ECF 18). No reason was stated in the dismissal motion or on the record.

Taken together, the defendants argue that these two cases show the Government knew or had reason to know that Louvado had a propensity for making false statements under oath, and they call for the production of documents and information to reveal what law enforcement agencies knew about Louvado, when they knew it, and why they permitted him to swear out wiretap and search warrant affidavits.

**Moore EEOC action**

Finally, in November 2021, the defendants submitted another supplemental memorandum (ECF 1692) in support of their motion for a new trial, this time discussing ATF Special Agent Timothy Moore's credibility rather than Louvado's. Moore's credibility was at issue because the government's opposition to the defendants' Louvado-focused motion for a new trial detailed how Moore and Special Agent Christian Aanonsen, rather than Louvado, were the key figures in the investigation.

The supplemental memorandum recounted the Government's April 2021 disclosure of an unrelated Equal Employment Opportunity Commission case whose final liability decision did not directly refer to Moore but did find for the complainant. (ECF 1692-3).

## ANALYSIS

The defendants have moved for a new trial under Rule 33 and *Brady*/*Giglio*. The court considers each in turn.

### I.      New evidence — Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial to the defendant if the interest of justice so requires." Fed. R. Crim. P. 33(a). Such motions should be awarded "sparingly," as "a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). Whether to grant or deny a motion for a new trial is within the district court's broad discretion, which should be disturbed only in very limited circumstances. *Perry*, 335 F.3d at 320.

The Fourth Circuit has developed a five-part test for evaluating motions for a new trial based on newly discovered evidence. A motion for a new trial should only be granted if:

>   (1) the evidence is newly discovered;

>   (2) the movant exercised due diligence in discovering the evidence;

>   (3) the evidence is not merely cumulative or impeaching;

>   (4) the evidence is material to the issues; and

>   (5) the evidence would probably result in an acquittal at a new trial.

*United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989) (going on to note that the evidence of guilt from other witnesses was "overwhelming" and that the district court had properly denied the motion for mistrial). A motion for a new trial requires a defendant to establish each of the five elements. *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001).

The defendants' core argument is that various judges would have denied key wiretaps and search warrants had Louvado disclosed his misconduct in the affidavits supporting those applications, because those judges would not have found his MMP-related statements credible. Louvado was the only affiant in those applications, and the defendants say the evidence resulting from those wiretaps and searches is tainted, effectively dismantling the government's case against all five defendants. Specifically, the defendants argue for the suppression of all evidence obtained as a result of the two wiretaps (TT1 and TT2) for which Louvado was the affiant; two additional wiretaps (TT3 and TT4) where the affidavit incorporated by reference Louvado's affidavit; and the 15 search warrants where Louvado was the affiant.

The defendants' Rule 33 motion hinges on the third, fourth, and fifth *Chavis* factors. The court finds that the evidence of Louvado's prior misconduct is impeachment evidence (*see* § I.A, *infra*) that is not material to the issues involved in this case and would not probably result in an acquittal at a new trial (*see* § I.B, *infra*).

A.  *Mere impeachment evidence*

First, the evidence of Louvado's misconduct is mere impeachment evidence. It calls into question the credibility of Louvado's claim that he believed in the credibility of five confidential informants whom investigators had used to make controlled drug purchases. This statement from his affidavit in support of TT1 was later incorporated into the applications for wiretaps TT2, TT3, and TT4. Those wiretaps produced evidence that formed the core of September 2016 and February 2017 search warrant applications that Louvado swore out.

This is "classic impeachment evidence that cannot satisfy the third prong of the *Chavis* test." *United States v. Ali*, 991 F.3d 561, 571 (4th Cir. 2021). This evidence "does not directly support some alternate theory of the crimes, nor does it provide any legal justification for" the

defendants' actions. *Id.* (citation and quotations omitted). Rather, it merely calls into question Louvado's "honesty on an issue orthogonal to the defendant's guilt." *Id.* (citation omitted). While Louvado's theft and resale of cocaine represents a deplorable betrayal of the public trust, this misconduct is not directly relevant to the purpose of his initial affidavit, in which he vouched for the credibility of key informants. That substantive connection would have been stronger if his proven misconduct and his affidavit statements were more tightly connected — for example, if his misconduct was that he had been known to lie about informants' statements and his affidavit primarily recounted what informants did or said. But that is not the case here. As impeachment evidence, the evidence of his theft goes only to Louvado's credibility and does not warrant the grant of a new trial. *Ali*, 991 F.3d 561, 571 (citing *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) ("Merely impeaching" evidence is ordinarily insufficient to justify a new trial) (cleaned up)). *See also United States v. Robinson*, 627 F.3d 941, 948–51 (4th Cir. 2010) (discussed at greater length in § I.B.3, *infra*).[2]

The defendants cite *United States v. Fisher* to argue that Louvado's misconduct is not mere impeachment evidence. 711 F.3d 460 (4th Cir. 2013). The case is similar at first glance: An officer-affiant who had committed fraud and theft lied in the sole sworn affidavit underpinning a search warrant for the defendant's residence and vehicle. *Id.* at 462. Those searches produced the evidence forming the basis of the charge — though the *Fisher* defendant pled guilty rather than go to trial. If the *Fisher* defendant had known of the officer-affiant's misconduct, he would have filed a motion to suppress that may have been successful. *Id.* at 463. The *Fisher* court held "that

---

[2]   The same analysis applies regarding the 2009 *Powell/Fitzgerald* and *Davis* cases, where the defendants argue that the true, submerged motive for the dismissals was that Louvado had lied pretrial. While the Government provides a compelling alternative explanation for the dismissal in *Fitzgerald*, the reasoning for the *Davis* dismissal remains unclear. Regardless, the *Davis* dismissal (and, less critically, the *Fitzgerald* dismissal) is, at best, impeachment evidence that does not meet the third requirement of the *Chavis* test. Failing to meet this requirement of the Rule 33 analysis, the court will consider *Davis* again only in the *Brady/Giglio* context, in which impeaching evidence is not barred and it is relevant to inquire into the prosecution's imputed knowledge (*see* § II, *infra*).

the officer's affirmative misrepresentation, which . . . tinged the entire proceeding, rendered the defendant's pleas involuntary and violated his due process rights." *Id.* at 462.

But the facts of *Fisher* are distinguishable, and Bailey's case does not present "highly uncommon circumstances in which gross police misconduct goes to the heart of the prosecution's case." *Id.* at 466. Though the *Fisher* officer-affiant had, like Louvado, committed theft unrelated to the case, he had also committed misconduct directly related to the *Fisher* case. The officer-affiant had lied about the source of the information he used in the affidavit, falsely attributing that information to a particular confidential informant. *Id.* at 463. The *Fisher* court did not make much of the officer-affiant's theft not being noted in the affidavit; instead, the untruthful statements in question concerned the informants and information central to the probable cause determination in Fisher's case specifically.

While it need not be the case that a motion to suppress undoubtedly would have prevailed if the defendant had known of the officer's misconduct, there is a wide gap between deliberate but tangential omissions about an affiant's general credibility and deliberate falsehoods with real factual nexus to the case itself. The Louvado misconduct is mere impeachment evidence that does not warrant a new trial under Rule 33.

### B. *Materiality to the issues and probability of acquittal*

This impeachment analysis bleeds into the other two key considerations: whether evidence of Louvado's misconduct was material to the issues of the defendants' case and whether the evidence would likely have resulted in an acquittal. The two questions are bound together closely.[3] Fourth Circuit caselaw does not provide an exact definition of materiality in

---

[3] In other Circuits applying the nearly identical *Berry* Test to analyze Rule 33 motions based on newly discovered evidence, "[t]he requirement that the evidence be material and not cumulative is closely related to the requirement that the evidence be such that it would probably produce an acquittal." 3 Charles Alan Wright & Arthur R. Miller,

the Rule 33 new evidence context, and the parties' briefs alternate between applying the

materiality standards from *Brady/Giglio* nondisclosures[4] and *Franks* suppression hearings.[5]

Under either standard, however, the Louvado evidence was not material to this case.

### 1.   *Brady Analysis*

The *Brady* analysis finds materiality where there "is a 'reasonable probability' of a

different result" had the favorable evidence been disclosed, such that the undisclosed information

"undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)

(quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). As discussed in § II, *infra*, the court

finds that the evidence of Louvado's theft was not material.

### 2.   *Franks Analysis*

A *Franks* materiality analysis looks at whether the omitted information was "necessary to

the finding of probable cause." *Franks*, 438 U.S. at 156. The court considers the "totality of the

circumstances," evaluating the affidavit as a whole and all circumstances set forth within.

*Colkley*, 899 F.2d at 301–02. This includes the effect the omitted information had on the

reliability of the affiant's information, whether the judge could properly consider the facts in the

affidavit as a basis for probable cause, and whether sufficient information remains to justify

---

*Federal Practice and Procedure* § 584 n.20 (4th ed. 2021) (collecting cases). The *Berry* factors are: (1) the evidence is truly newly discovered; (2) the failure to learn of the alleged newly discovered evidence was not because of a lack of due diligence; (3) the new evidence is not merely impeaching or cumulative; (4) the alleged newly discovered evidence is material; and (5) the alleged newly discovered evidence is of such a nature that if introduced at trial it would probably produce an acquittal. *Id.* § 584 n.8; *see, e.g.*, *United States v. Forbes*, 790 F.3d 403, 406–407 (2d Cir. 2015).

[4] To prove materiality of a *Brady/Giglio* nondisclosure, the defendant must show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (internal quotation marks omitted); *accord United States v. Robinson*, 627 F.3d 942, 951–52 (4th Cir. 2010).

[5] To prove materiality in a *Franks* suppression hearing, "the defendant must show that 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (4th Cir. 2016)).

probable cause even after excluding the statements colored by the omitted information. See *United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016).

The defendants rely heavily on *United States v. Lull*, in which the affiant omitted facts about his confidential informant's dishonest conduct during the controlled buy that substantiated a subsequent warrant application. *Lull*, 824 F.3d at 118. Much of the information in the affidavit came solely from that informant, and the magistrate could not accurately assess the reliability and the veracity (and thus the significance) of the informant's statements. *Id.* And when the *Lull* court removed the informant's information from the affidavit (considering only the information actually presented to the magistrate), "little remain[ed]" — nothing identifying the defendant specifically as the seller or connecting him to the drug transaction. *Id.* at 118–19, 119 n.3.

*Lull* is distinguishable from this case. As noted in § I.A, *supra*, the evidence of Louvado's thefts went to his credibility but did not directly relate to the facts of this particular case as declared in his affidavit. In contrast, the *Lull* court focused almost exclusively on the informant's theft of the controlled buy money, an action that was not "separate" from the controlled buy in the way Louvado's was. *Id.* at 116. Instead, the *Lull* informant demonstrated that he was unreliable "during the course of [that] very transaction." *Id.* The Lull court discussed the implications for the informant's reliability but largely ignored the officer-affiant's credibility, which is the focus of the defendants' claims about Louvado's misconduct. *Id.* at 118. Finally, eliminating the *Lull* informant's contributions to the search warrant application left the application facially insufficient. *Id.* at 119. Not so here; excluding every statement Louvado made as a remedy for misconduct that did not bear on the substantive, case-related information in his affidavit is not warranted. Excluding any declarations from Louvado as to his personal honesty or including the omitted information about the 2009 theft still leaves sufficient

confidential informant and other information to justify probable cause for the wiretaps and searches.

### 3.   Corroboration and Louvado's involvement

As a coda on materiality and likelihood of acquittal, this court considers *United States v. Robinson*, where the Fourth Circuit found it immaterial that four officers who had participated in the investigation had been dismissed for misconduct unrelated to the particular case. 627 F.3d 941, 948–51 (4th Cir. 2010). Their misconduct, "while serious, did not relate to Robinson's case or to the truth-finding function of the criminal proceeding." *Id.* at 949.

In discussing the misconduct evidence's materiality and the likelihood of acquittal, the Fourth Circuit acknowledged the officers had played some role in obtaining evidence but noted that the defendant had overstated their impact on the trial. *Id.* at 950. The counts in question stemmed largely from a separate investigation not run by their office, an investigation where the four dismissed officers "played only bit parts" and would have been paired at all times with agents from another office not under scrutiny. *Id.* at 950. The court also pointed to "the impressive amount of evidence" from other sources. *Id.* at 950.

These same reasons apply here. Louvado did not engage in misconduct related to the defendants' case and did not affect the truth-finding function of the trial. The substance of his affidavit remains unchallenged as to the confidential informants he discussed. He was accompanied by other officers at all times during controlled drug buys and search warrant executions, and there is no indication that he was alone while making observations, taking statements, or recovering evidence.

*Robinson* is not a perfect analogy. The Fourth Circuit noted that even eliminating "*all traces of evidence from the dismissed officers*", there remain[ed] overwhelming evidence" of the

16

defendant's guilt. *Id.* at 950 (emphasis added). The defendants in this case urge this court to follow this dictum, taking a hatchet to the wiretaps and search warrants. But a scalpel is more appropriate given the tenuous connection between the misconduct and the case and given the tremendous corroboration available from confidential informants, other investigators, and trial witnesses. It is more appropriate to eliminate all traces of evidence *solely* from Louvado, paying attention — as in *Robinson* — to when he was paired with other officers as opposed to when he was alone with informants or solely responsible for evidence collection.

Finally, and with a view to the administration of justice overall, the *Robinson* court hesitated to invite credibility mini-trials motivated by unrelated misconduct evidence. Sharing these concerns, this court wishes to acknowledge Louvado's wrongdoing but still preserve the finality of criminal proceedings except where the interests of justice truly demand otherwise. Louvado's drug thefts are reprehensible but not material to the defendants' case, and knowledge of Louvado's misconduct would not likely result in acquittal at a new trial.

## II. *Brady/Giglio*

The defendants maintain that the government's failure to disclose Louvado's crimes violated due process under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (expanding *Brady* from exculpatory evidence to impeachment evidence). To prove a *Brady* violation, a defendant must show that non-disclosed evidence was (1) favorable to the accused, either because it was exculpatory or impeaching; (2) material to the verdict at trial; and (3) suppressed by the prosecution (i.e., the prosecution had it but failed to disclose it). *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *accord United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018), cert. denied, 139 S. Ct. 278 (2018). The Fourth Circuit has instructed courts to be "cautious . . . about importing the panoply of *Brady* protections from trial

practice into warrant application proceedings." *United States v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990).

Prosecutors are responsible for obtaining and disclosing evidence. Law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant. *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 396 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). Notably, in some circumstances, "the knowledge of some who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness." *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010); *accord Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Nevertheless, there are no "hard and fast lines about the scope of *Brady* imputation . . . ." *Robinson*, 627 F.3d at 952.

The *Brady* right is, at its core, a "*trial* right." *United States v. Moussaoui*, 591 F.3d 263, 285–86 (4th Cir. 2010) (discussing but not ultimately resolving whether to extend the *Brady* right to exculpatory information, as distinguished from impeachment evidence, in the pretrial context of guilty pleas).[6] "It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment, and exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." *Moussaoui*, 591 F.3d at 285.

---

[6] Though there is a well defined circuit split on the question, at least the First, Second, and Fifth Circuits have also expressed doubts about whether the *Brady* right is active pretrial, specifically in the guilty plea context. *See United States v. Mathur*, 624 F.3d 498, 506–07 (1st Cir. 2010) ("The animating principle of *Brady* is the avoidance of an unfair trial. It is, therefore, universally acknowledged that the right memorialized in *Brady* is a trial right." (internal citations and quotation marks omitted)); *United States v. Meza*, 843 Fed. App'x 592, 599 n.3 (5th Cir. 2021) (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 395 (5th Cir. 2018)); *Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010). Unpublished cases are cited for persuasive reasoning, not binding precedent.

Neither the Supreme Court nor the Fourth Circuit has ruled on whether the right covers impeachment information at the search warrant stage. The Constitution does not require the government to disclose material impeachment evidence prior to a plea agreement. *United States v. Ruiz*, 536 U.S. 622, 629–33 (2002). In *Ruiz*, the Court noted first that impeachment information is special in relation to the fairness of a trial, not in relation to the voluntariness of a plea. *Ruiz*, 536 U.S. at 629. Second, the due process considerations that motivate *Brady/Giglio* factor in not only (1) the nature of the defendant's private interest in disclosure of impeachment information but also (2) the value of a disclosure requirement at that stage and (3) the adverse impact of such a disclosure requirement upon the government's interests. *Id.* at 631 (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). The *Ruiz* court additionally acknowledged the government's concern over premature disclosure of government witness information, which could disrupt ongoing investigations. *Id.* at 631–32.

*Brady* also imposes a materiality requirement. Evidence is "material" to the verdict at trial if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (internal quotation and citation omitted); *accord United States v. Robinson*, 627 F.3d 942, 950–52 (4th Cir. 2010). Thus, "*Brady* does not 'automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) (quoting *Bagley*, 473 U.S. at 677). The court must examine the trial record and evaluate the withheld evidence in the context of the entire record to make its determination as to the reasonable probability of a different result. *Turner v. United States*, 137

19

S. Ct. 1885, 1893 (2017) (cleaned up) (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976), and *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "As a general matter," a showing that there is "evidence that merely impeaches those *who do not testify* lacks relevance, much less materiality." *United States v. King*, 628 F.3d 693, 703–04 (4th Cir. 2011) (citing *United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997)) (emphasis added).

The core issues in this case are (1) whether *Brady* reaches search warrant impeachment omissions, and whether the government knew of (2) material impeachment information (3) in time for a disclosure that would affect the suppression hearings and therefore the trial.

The defendants argue that Louvado's misconduct affected their trial rights, because the outcome of the trial would have been more favorable to them had they or the warrant-issuing judges known of the misconduct in time for a *Franks* challenge. They say this as though the government's case depended entirely on Louvado's testimony — at least at the warrant application stage, even if not at trial. As with other arguments they make in their motion, their theory of the case relies on the notion that anything Louvado touched would be excluded from trial, effectively dismantling the government's case in one fell swoop.

The government, meanwhile, argues first that *Brady* applies only to trials and exists to preserve the fairness of a trial verdict and to prevent wrongful convictions. They note that *Ruiz*'s limitations on the *Brady* right should apply not just to the guilty plea stage but also to search warrant applications. They argue that courts have not expanded the *Brady*/*Giglio* obligation to search warrant affiants who did not testify at trial, especially not where the impeachment evidence is unrelated to the facts of the case. On the contrary, the Fourth Circuit has expressed caution about expanding *Brady* to warrant application proceedings. *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (citing *Colkley*, 899 F.2d at 302–03). Requiring warrant

applications to disclose all potentially exculpatory or impeaching information would be overly burdensome given that the consequences of search or arrest are less severe and irremediable than *Brady*'s primary concern: conviction. *Colkley*, 899 F.2d at 301–03. Instead, a *Franks* analysis (*see* § I.B.2) should govern.

Even if *Brady* should extend backward to information that would impeach non-testifying search warrant affiants, there was no *Brady*/*Giglio* obligation here because there was no suppressed material information. Gun Trace Task Force investigators first learned of a direct allegation of Louvado's wrongdoing on April 9, 2019, three weeks into the MMP trial. They immediately relayed the information to USAO supervisors. At that point, the trial AUSAs, though not having been advised of any *Brady* or *Giglio* concerns with Louvado, had already determined not to call Louvado as a witness, according to the government's briefing (ECF 1554 at 47). After learning of the allegations of wrongdoing, the USAO supervisors saw no *Giglio* obligation: Louvado would not testify at trial; there was no suggestion of misconduct during the MMP investigation; the information in the Louvado-authored warrants could be independently verified by other officers and evidence; and the covert GTTF investigation remained active.

The defendants do not state a true *Brady*/*Giglio* claim. They ask that they be granted a new trial because the government did not (in time for June and August 2018 motions hearings) disclose information that neither the USAO nor GTTF investigators learned until April 2019. On the defendants' theory, *Brady*/*Giglio* was first triggered not by the April 2019 direct allegations of drug theft and resale (the focus of the defendants' motion) but rather by a July 2017 witness proffer circumstantially noting that Louvado had bought a new car and potentially a new boat sometime shortly after an illegal search warrant execution by the GTTF. This is especially tenuous given an August 2017 meeting with the same witness, who told USAO officials

21

(including the trial AUSAs) that he had not seen Louvado steal money and he did not know whether Louvado had participated. Summer 2018 subpoenas of Louvado's financial records at that time did not reveal any large cash infusions directly after the 2009 search, and Louvado denied knowledge of any criminal activity in a March 2018 interview. There was no corroborated accusation against Louvado at the time of the summer 2018 MMP motions hearings or the spring 2019 trial, but the defendants nonetheless argue for suppression.

And even if the government had known of Louvado's drug thefts at the time of the motions hearings or the trial, the information is not material under *Brady*. Considering the withheld evidence in the context of the entire record, this court concludes that "it is too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards." *Turner*, 137 S. Ct. at 1894. It is not reasonably probable that knowledge of Louvado's unrelated drug thefts could have led to a different result at trial, given the weakness of any hypothetical *Franks* challenge (*see* § I.B.2), the fact that Louvado did not testify at trial, and that there was ample corroboration for any information tied to Louvado. Confidence in the defendants' guilty verdict remains unshaken in the face of nondisclosure of this unavailable-at-the-time, non-case-related impeachment information about a non-testifying witness.

The defendants' last argument as to Louvado is that the dismissals of the 2009 *Davis* case and, less convincingly, the 2009 *Fitzgerald* case, are *Brady*/*Giglio* evidence that the United States Attorney's Office knew of and should have disclosed even before the April 2019 first direct misconduct allegations related to theft. Even assuming that *Brady*/*Giglio* obligated disclosure about non-testifying search warrant affiants (an unsettled question, as noted *supra*), this information is distinct from the kind of exculpatory or impeachment evidence that is most clearly contemplated by the *Brady*/*Giglio* regime. Although it is possible that someone other than

Louvado (that is, federal prosecutors who worked the 2009 cases) may have had some idea of Louvado's potential dishonesty and impropriety, the facts (1) that the affected officers and prosecutors worked across state/federal lines and (2) that the alleged dishonesty in *Davis* and *Fitzgerald* was unrelated to the investigation of the *Bailey* defendants together cut against a finding that knowledge of the 2009 *Fitzgerald* and *Davis* allegations should be imputed to the 2019 *Bailey* prosecutors and investigators. *See Robinson*, 627 F.3d at 952. Indeed, courts have

> routinely refused to extend *Brady*'s constructive knowledge doctrine where doing so . . . would require prosecutors to do full interviews and background checks on everyone who touched the case. And with good reason: it is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case.

*Id.* (internal citations omitted). More importantly, the defendants' allegations of Louvado's 2009 dishonesty are circumstantial speculation at best and are not enough to justify the extraordinary remedy they seek in comprehensive production of documents and information about every detail of what law enforcement agencies knew about Louvado. Nor does this speculation warrant a new trial.

The defendants' final argument attacked Moore's credibility by raising evidence of an unrelated EEOC case Moore had been involved in. The final decision contained no cognizable finding of Moore's lack of credibility that would affect the reliability of his corroboration of the overwhelming evidence produced during the MMP investigation. No new trial is warranted on this basis.

### III. Reopening Frazier's Suppression hearing

For the reasons articulated above, Frazier has failed to show that there is a basis to reopen his motion to suppress.

## CONCLUSION

For the reasons discussed above, the defendants' motion for a new trial (ECF 1505) and Frazier's motion to reopen his suppression hearing (ECF 1502) will be denied. A separate Order follows.


May 9, 2022                                              /s/
Date                                          Catherine C. Blake
                                              United States District Judge